LAUREN I. SCHOLNICK (Bar No. 7776)
JONATHAN K. THORNE (Bar No. 12694)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Plaza 7-21
Salt Lake City, UT 84106
Tel: (801) 359 4169
Fax: (801) 359 4313
lauren@utahjobjustice.com
jonathan@utahjobjustice.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| **ANTONIO BRATCHER and RICARDO RODRIQUEZ,** | **COMPLAINT** |
| Plaintiffs, | **(Jury Demanded)** |
| v. | |
| **CHEVRON CORPORATION**; **CHEVRON U.S.A. INC.**; and **BRAHMA GROUP, INC.** | Civil No. 1:17cv00143 BSJ |
| Defendants. | Judge Jenkins |

Antonio Bratcher and Ricardo Rodriquez ("Mr. Bratcher" and "Mr. Rodriquez" or "Plaintiffs"), by and through their undersigned attorneys, hereby complain and allege against Defendants Chevron Corporation, Chevron U.S.A. Inc., and Brahma Group, Inc. (collectively "Defendants") as follows:

## NATURE OF THE CLAIMS

1.      This action is brought against Defendants pursuant to: 42 U.S.C. § 1981 ("§ 1981") and 42 U.S.C. § 2000e *et seq*. ("Title VII") for discrimination and retaliation; and Utah state law for intentional interference with economic relations.

2.      Plaintiffs seeks damages, attorneys' fees, costs and interest, emotional distress, punitive, compensatory, and all other awardable damages.

## PARTIES

3.      Chevron Corporation is a Delaware corporation that operates a refinery in Salt Lake City, Utah. Plaintiffs were employed at this refinery.

4.      Chevron U.S.A. Inc. ("Chevron USA") is a Pennsylvania corporation. Upon information and belief, Chevron USA is a subsidiary of Chevron Corporation, and manages and operates most of Chevron Corporation's United States businesses.

5.      Chevron USA operates the Salt Lake Refinery through its division Chevron Downstream and Chemicals Corporation, Salt Lake Refinery ("Chevron Downstream"). In response to Plaintiffs' Charges of Discrimination against Chevron Corporation, Chevron Downstream claimed it was the appropriate entity to respond to the Charges, and further indicated that Chevron Downstream was "a division of Chevron U.S.A. Inc."

6.      Based on the foregoing and upon information and belief, Chevron Corporation and Chevron USA (collectively, "Chevron") is a single enterprise. As such, all Chevron entities operate and manage the Salt Lake City, Utah refinery where Plaintiffs worked.

7.      Brahma Group, Inc. ("Brahma") is a Nevada company with its headquarters in Salt Lake City, Utah. Plaintiffs worked for Brahma at the Chevron refinery at all times relevant to the allegations in this Complaint.

8.      Upon information and belief, because Chevron contracted with Brahma to provide construction and maintenance labor to the refinery, both Chevron and Brahma were joint employers of Plaintiffs.

9.      Plaintiff Antonio Bratcher resides in the State of Utah, Davis County, and was working for Defendants (Chevron and Brahma) at the Salt Lake City, Utah refinery at all times relevant to the allegations in this Complaint.

10.     Plaintiff Ricardo Rodriquez resides in the State of Utah, Davis County, and was also working for Defendants (Chevron and Brahma) at the Salt Lake City, Utah refinery at all times relevant to the allegations in this Complaint.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over the claims against Defendants pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Plaintiffs' claims either arise under federal law or are supplemental to such federal question claims.

12.     Venue is proper in this District pursuant to 29 U.S.C. § 1391 as the events alleged herein all took place within and Defendants are either located or operate a business within this judicial district.

## ADMINISTRATIVE PROCEEDINGS

13.     Plaintiffs filed timely Charges of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

14.     On June 9, 2017, EEOC issued Plaintiffs a *Notice of Right to Sue* in each individually filed Charge.

15.     All administrative prerequisites have been met.

## FACTUAL BACKGROUND

## Business Relationship between Chevron and Brahma

16.     Brahma is an engineering and construction service company that furnishes, installs and maintains industrial equipment and piping and performs related services throughout Utah. Brahma contracts with Chevron for labor to provide these services.

17.     Upon information and belief, over 80% of the workforce operating Chevron's Salt Lake City refinery is comprised of employees of companies that contract with Chevron to provide services/labor to the refinery, including Brahma.

18.     Although Chevron utilizes subcontractors to provide its workforce, Chevron acts as a joint employer of these subcontractors' employees because it exercised significant control over these employees.  This includes but is not limited to the following:

  a.     Controlling the hiring of subcontractor employees by determining which employees are authorized to work at the refinery;

  b.     Providing all training, including human resource training, training on Chevron policies and procedures, chemical training and safety training;

  c.     Firing subcontractor employees;

  d.     Ejecting subcontractor employees from the refinery, refusing them access to the refinery property, or refusing to allow them to work;

e.     Directing subcontractors to discipline and/or fire its employees;

f.     Awarding pay bonuses for hitting Chevron safety milestones;

g.     Assigning daily work directly to subcontractor employees;

h.     Assigning work indirectly through a subcontractor foreman;

i.     Approving subcontractor employee work schedules and overtime; and

j.     Drug testing subcontractor employees.

### **ANTONIO BRATCHER**

19.     Mr. Bratcher, who is African American, began working at the Chevron refinery after he was hired by Holmes & Holmes Industrial, Inc. (Homes & Holmes) in early 2006.

20.     During the time he worked at the Chevron refinery, Mr. Bratcher and his brother Joby, who was also employed by Holmes & Holmes, were subjected to racial harassment.

21.     This included repeatedly being called the "N" word and being subjected to degrading and racist jokes.

22.     Paul Facer, Holmes & Holmes' foreman, was the main perpetrator of this racial discrimination.  On numerous occasions over a several year period, Mr. Bratcher and Joby Bratcher (collectively the "Bratcher Brothers") complained about the discrimination to Holmes & Holmes' owners and Human Resources Director.  Despite these reports, Holmes & Holmes did not stop the discrimination.

23.     As a result, on or about August 18, 2008, the Bratcher Brothers reported to Don Brady, Chevron's Safety Observer, that they were experiencing racial harassment/ discrimination at Chevron's refinery.

24.     Later that day, the Bratcher Brothers reported the same thing to Casey Valdez, Chevron's Routine Maintenance Team Lead.  They told Mr. Valdez that they had reported the harassment and discrimination numerous times to no avail, and they asked him to intervene.

25.     The Bratcher Brothers asked Mr. Valdez to attend a meeting with Holmes & Holmes, wherein they would address the ongoing racial harassment/discrimination. They explained to Mr. Valdez that they needed him to lend his support because they felt intimidated each time they complained.  Mr. Valdez agreed to attend the meeting.

26.     The Bratcher Brothers also told Mr. Valdez that numerous Chevron refinery supervisors were aware of and had witnessed the racial harassment/ discrimination, including John Weaver, Tony McCluskie and Gary Reamer, but had not done anything to stop it.

27.     In April 2009, the Bratcher Brothers filed a Charge of Discrimination with the EEOC alleging racial harassment/discrimination against Holmes & Holmes, which lead to the EEOC filing a lawsuit on that Charge on September 28, 2010.  The Bratcher Brothers intervened in that suit and brought their own claims under 42 U.S.C. § 1981. That lawsuit was resolved in March 2013.

28.     Around the same time the Bratcher Brothers reported the harassment to Chevron and Holmes & Holmes, Chevron conducted a drug test of the Holmes &

6

Holmes' crew, and as a result, Chevron ended its contract with Holmes & Holmes. Brahma then hired members of the Holmes & Holmes crew, including Mr. Bratcher.

29.     Mr. Rodriquez, who is Latino, did not know Mr. Bratcher but was Brahma's project manager at the Chevron refinery. Mr. Rodriguez hired Mr. Bratcher in September 2008 to work as a pipefitter at the Chevron refinery.

30.     While employed by Brahma, Mr. Bratcher never received any written or oral discipline, other than a suspension he received when he opposed his co-workers' racially hostile action of swinging a lynching noose toward him.

31.     Because both Brahma and Chevron management knew that Mr. Bratcher had sued his former employer, Holmes & Holmes, for racial harassment and discrimination, those managers ignored Mr. Bratcher and scrutinized his work more harshly than other employees' work.

32.     For example, if Chevron manager, Jeff Fullmer, needed Mr. Bratcher to do a task, he would talk to another crew member to direct Mr. Bratcher to complete the task.

33.     Despite this discriminatory/retaliatory conduct from other managers, Mr. Bratcher's immediate supervisor, Mr. Rodriquez, appreciated his consistent excellence and responsible performance. Indeed, Mr. Rodriquez even asked Mr. Bratcher to act as a supervisor over many other pipefitters at the refinery.

34.     In addition to being shunned by Chevron managers, Chevron allowed workers at the refinery, included employees on Chevron's payroll, to make insulting racial comments and act in a racist manner, but took no action to correct this type of harassment.

35.     For example, Todd Ripley (a Chevron supervisor who managed the Chevron contract with Brahma) referred to Mr. Bratcher as "nigger" and to Mr. Bratcher and Mr. Rodriquez as "the brown guys,"

36.     Further, Chevron refused to identify the source of racist graffiti in its portable toilets, notwithstanding ongoing worker reports.

37.     Additionally, Jeff Fulmer, a Chevron manager, drove a mule (an all-terrain vehicle) with a stuffed monkey hanging from a noose on its rear view mirror, which he substituted for a stuffed polar bear only after the Bratcher Brothers brought suit against Holmes & Holmes.

38.     On or about September 27, 2013, several Brahma crew members (Dustin Morgan, Mike Hodges, and Kendall Randon) began tying a lynching noose in front of Mr. Bratcher.

39.     Mr. Bratcher immediately went over to the crew foreman, Robert Upchurch, who saw what was happening. Mr. Bratcher ask Upchurch to stop the noose tying, yet Upchurch refused. Thereafter, Hodges swung the noose toward Mr. Bratcher.

40.     This occurred directly across from the Chevron's Administration office. Mr. Bratcher kept looking through that office window wondering when a Chevron administrator would come out and put a stop to it, but no one did.

41.     When the shift ended, Mr. Bratcher addressed the incident with the workers in the Brahma employee trailer.

42.     All of the shift employees were getting ready to go home and Mr. Bratcher told about 30-40 workers to "listen up."

43.     Mr. Bratcher then announced that he did not appreciate the noose and explained why it was offensive to him to tie a noose, let alone swing it at him, or any other black man.

44.     In front of the group, when Morgan tried to deny he was involved in the noose tying, Mr. Bratcher insisted he was.

45.     After that, Morgan physically threatened Mr. Bratcher, saying he would wait outside the gate for Mr. Bratcher.

46.     Although Morgan was waiting for him, Mr. Bratcher, accompanied by some supportive coworkers, was able to drive through the gate and leave for home.

47.     Later that night, Mr. Bratcher called Mr. Rodriquez, who was on vacation, to report the harassment and the subsequent threats.

48.     Mr. Rodriquez told Mr. Bratcher that he had already been in contact with Chevron, as Chevron required notification of any report of discrimination made by Brahma employees.

49.     On the following work day, Mr. Bratcher was summoned to a meeting with Todd Ripley and John Wadlow, the president of the Local 140 Union, the pipefitters local at the refinery.

50.     Ripley told Mr. Bratcher that Chevron would investigate the situation, but he never did so, even though less than a year before a Chevron manager discovered a hangman's noose slung over a pipe right outside a warehouse break room.

51.     Mr. Rodriquez accompanied Mr. Bratcher to the meeting.

52.     Later that week, in late September/early October 2013, Brahma called Mr. Bratcher to a meeting with Mr. Rodriguez, Jed Iverson, an executive with Brahma, and Greg White, an owner of Brahma, to explain what happened.

53.     Iverson and White wanted to fire Mr. Bratcher for getting angry, but they did not mention either noose or the threats of violence made against Mr. Bratcher after he spoke to the other workers.

54.     Iverson also told Mr. Bratcher that he had looked him up on the internet and knew that he "had been a problem for other employers" (referring to the Holmes & Holmes lawsuit).

55.     Iverson and White then asked Mr. Bratcher to wait outside while the Brahma managers discussed the noose incident.

56.     At that point, Mr. Rodriquez adamantly defended Mr. Bratcher, explaining Brahma should not discipline Mr. Bratcher because he was only responding to race harassment by the others.

57.     White told Mr. Rodriquez that he felt that Mr. Bratcher overreacted and should not have been upset about the noose, as it was not a big deal.

58.     Shortly thereafter, White came out of the trailer and sat down by Mr. Bratcher and began lecturing him in a demeaning manner.

59.     White asked Mr. Bratcher about his lawsuit against Holmes & Holmes and said that he felt the Holmes were good guys.

60.     White said he believed that Mr. Bratcher had "the devil inside" of him, which is why Mr. Bratcher could not "let this type of stuff go."

61.     White told Mr. Bratcher that he (White) had called another black employee a "Nigger" and that that employee took no offense.

62.     Mr. Bratcher told White that the only reason the former employee did not oppose the epithet was because he knew White could fire him.

63.     Mr. Rodriquez later interceded to stop White, explaining that there must be an investigation of the entire incident.

64.     Then, White told Mr. Bratcher to go home, explaining that both he and Chevron would investigate and then inform Mr. Bratcher what his discipline would be.

65.     The next day, Mr. Bratcher met with Sean Davis, President of Brahma, and White.

66.     In that meeting, Davis told Mr. Bratcher that his daughter "married a half and half" (referring to an individual who was half African American, half Caucasian) and, as a result, he "knows how you guys are," referring to Mr. Bratcher and other African Americans.

67.     Davis and White explained that they were disciplining Mr. Bratcher with a three-day suspension without pay.

68.     Chevron did not conduct an investigation into the noose incident, leaving it entirely up to Brahma.

69.     Eventually, Brahma fired just two of the workers responsible for tying and swinging the noose, leaving others involved in supervisory roles.

70.     Local union president, John Wadlow, summoned Mr. Bratcher to a meeting, asking Mr. Bratcher "how [he] felt about getting two people fired." Additionally, local union members hassled Mr. Bratcher over the incident.

## RICARDO RODRIQUEZ

71.     Mr. Rodriquez began working at the Chevron refinery after Brahma hired him in February 2001 as a traveling boiler powerhouse worker.

72.     Brahma promoted Mr. Rodriquez to superintendent in 2002 and then to site manager in or around 2004.

73.     As site manager, Mr. Rodriquez continuously worked at the Chevron refinery.

74.     Mr. Rodriquez was responsible for all daily activities of the Brahma crew working construction at the refinery, including hiring and training of crew members in conjunction with Chevron.

75.     Brahma never disciplined Mr. Rodriquez and, instead, continually promoted and praised him for his performance.

76.     Chevron chose him to serve on refinery leadership teams and often invited him to Chevron events.

77.     He was well regarded for serving Chevron by delivering work on time and on budget.

78.     At the time he was fired, Mr. Rodriquez was the longest serving site manager of any refinery contractor.

79.     Throughout his employment, Mr. Rodriquez experienced racist comments made both to him and about him by Brahma managers and crew members and Chevron managers.

80.     For example, Mr. Ripley often called Mr. Rodriquez "the whitest Mexican I've ever seen" and asked how a Latino could have been promoted into the site manager position.

81.     Often, Mr. Ripley denigrated Mr. Rodriquez in meetings with other contractors and Chevron managers, even though Mr. Rodriquez had told Mr. Ripley repeatedly that he did not appreciate being demeaned.

82.     Although Mr. Rodriquez attempted to ignore these statements because he liked his job and feared retaliation if he reported them, these racist statements continued until Mr. Rodriquez's termination in November 2014.

83.     In July 2011, Mr. Rodriquez hired Antonio Bratcher's brother, Joby Bratcher, as a pipefitter at the refinery.

84.     On August 1, 2011, Joby reported to work at the Chevron site for training.

85.     Approximately an hour into the training, Chevron management pulled Joby out of the class and later told him that he could not ever work at the refinery.

86.     Upon learning that Joby had been removed from the site, Mr. Rodriquez met him at the gate and told him he had no idea why he was being removed because Chevron had previously approved his hire and entry to the Chevron site.  Mr. Rodriquez told Joby that he would try to get to the bottom of it.

87.     A few days later, Mr. Rodriquez asked a Chevron manager why Joby had been banned from the Chevron refinery.

88.     The manager turned it back on Mr. Rodriquez:  "Why would you want to hire someone who has already sued their employer?," referring to the Holmes & Holmes lawsuit.

89.     At the time, Mr. Rodriquez knew nothing of the Bratcher Brothers' prior suit.

90.     In September 2013, when Mr. Rodriquez defended against the proposed firing of Antonio Bratcher after the lynching noose incident, it was clear that White and Iverson were unhappy that Mr. Rodriquez did not go along with the termination.

91.     White explained to Mr. Rodriquez that he felt Mr. Bratcher was trouble, because he had sued Holmes & Holmes. White told Mr. Rodriquez that he (White) knew Mike Holmes was a good guy because he's a Mormon bishop, like White himself.

92.     After reporting the lynching noose and then opposing Mr. Bratcher's firing, things changed for Mr. Rodriquez at the refinery.

93.     Both Chevron and Brahma management started avoiding him and finding fault with his performance.

94.     This was consistent not only with management's treatment of Mr. Bratcher, but it was also part of a pattern of targeting those who reported discrimination or harassment.

## JOBY BRATCHER'S CASE AGAINST CHEVRON

95.     On April 29, 2014, Joby Bratcher filed suit against Chevron for prohibiting him from working at the refinery. Joby asserted claims against Chevron for retaliation for filing a prior suit of race harassment against Holmes & Holmes.

96.     In the Complaint, Mr. Rodriquez is named as a key witness, as he would be able to substantiate Chevron's liability for ejecting Joby Bratcher for illegal reasons.

97.     On August 15, 2014, Joby Bratcher disclosed to Chevron both Mr. Rodriquez and Mr. Bratcher as witnesses in his suit.

98.     On September 29, 2014, Brahma was served with subpoenas requesting information related to Joby's lawsuit. Specifically, Brahma was asked to provide: 1) all information it had concerning either Antonio or Joby Bratcher; 2) any communication that any Brahma employee (*e.g.*, Mr. Rodriquez) had with Chevron concerning Joby; and 3) any investigation into why Chevron prohibited Joby from working at the refinery.

99.     Brahma refused to provide any information without releases from Antonio and Joby Bratcher.

100.    On October 28, 2014, Joby's attorneys contacted Brahma office manager, Suzy Rampton, to provide the releases.

## TERMINATIONS OF RODRIQUEZ AND BRATCHER

101.    In October 2014, Mr. Rodriquez's manager at Brahma, Tony Archibald, began telling Mr. Rodriquez that Chevron manager Todd Ripley was putting pressure on Brahma to have Mr. Rodriquez fired.

102.    Throughout the following weeks, Archibald continued to reiterate to Mr. Rodriquez that he was getting increased pressure by Chevron management to have Mr. Rodriquez removed from the refinery.

103.    In these conversations, Archibald continually told Mr. Rodriquez that he was an excellent employee and that Brahma did not want to fire him.

104.    However, Archibald disclosed that Ripley threatened that Brahma might lose its Chevron contract if Brahma did not get rid of Mr. Rodriquez.

105.    Ultimately, on October 30, 2014, Archibald told Mr. Rodriquez that Ripley demanded that Brahma fire Mr. Rodriquez.

106.    Archibald then put Mr. Rodriquez on leave and told him about Ripley's "unhappiness" with him. Specifically, Ripley said that Mr. Rodriquez had become complacent in his position.

107.    Not only had Mr. Rodriquez not altered his workplace habits in the ten years as a Chevron site manager, no one at either Chevron or Brahma had communicated this concern to Mr. Rodriquez.

108.    Over the course of the next couple of weeks, Brahma maintained Mr. Rodriquez on paid leave.

109.    However, on November 10, 2014, Archibald fired Mr. Rodriquez.

110.    Shortly thereafter, on November 20, 2014, Brahma fired Mr. Bratcher, claiming that he was part of a seasonal layoff due to slow down at the refinery.

111.    Although Mr. Bratcher had worked for Brahma for six years, Brahma had never before selected Mr. Bratcher for a seasonal layoff, instead keeping him working continuously.

112.    In November 2014, however, Defendants retained workers with less than one year of experience while Mr. Bratcher had worked at the refinery for nine years.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation § 1981 and Title VII)

113.    Plaintiffs reallege and incorporate by reference those paragraphs set forth above.

114.    Plaintiffs, by participating in lawsuits concerning race harassment and retaliation under 42 U.S.C. § 1981 and Title VII and by reporting and opposing racial harassment at the Chevron refinery, engaged in protected activity under 42 U.S.C. § 2000e-3(a) and 42 U.S.C. § 1981.

115.    Defendants were aware of Plaintiffs' protected activities and fired Plaintiffs in retaliation for these activities, which constitutes unlawful retaliation under 42 U.S.C. § 1981 and Title VII.

116.    As a result of Defendants' unlawful conduct, Plaintiffs have been injured and are entitled to recover lost back wages and benefits, future lost wages and benefits, and compensatory damages for emotional distress and suffering.

117.    Because Defendants' discriminatory actions were done maliciously and in reckless and wanton indifference to Plaintiffs' civil rights, Plaintiffs seek punitive damages sufficient to prevent Defendants from engaging in similar practices and to send a clear

signal that such intentional and flagrant discrimination will not be tolerated in the State of

Utah.

118.   Plaintiffs are entitled to their reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Harassment in Violation § 1981 and Title VII)

119.   Plaintiffs reallege and incorporate by reference those paragraphs set forth

above.

120.   Mr. Bratcher is African American and Mr. Rodriquez is Latino.

121.   Defendants created a hostile work environment because of Plaintiffs' race,

color, and national origin.

122.   Defendants' treatment of Plaintiffs was unwelcome.

123.   Defendants' harassment of Mr. Bratcher included, but was not limited to:

using racial epithets to refer to him and making racially derogatory comments in front of

him; threatening him with violence; threatening him with a lynching noose; treating him

with hostility; failing to adequately investigate his reports of race hostility; embarrassing

him in front of his peers; disciplining him for no proper reason; and laying him off.

124.   Defendants' harassment of Mr. Rodriquez included, but was not limited to:

using racial epithets to refer to him and making racially demeaning comments in front of

him; treating him with hostility; embarrassing him in front of his peers; ignoring him;

failing to support him; and firing him.

125.    Defendants' discriminatory and harassing treatment towards Plaintiffs was so severe and/or pervasive that it altered the conditions of their employment and had an adverse impact on their working environment, eventually leading termination.

126.    Defendants knew of the harassment and hostile environment perpetrated by its managers and Plaintiffs' co-workers, but failed to take immediate and appropriate remedial action.

127.    Moreover, Defendants are directly liable for the hostile work environment created and maintained by its supervisory level employees.

128.    As a result of Defendants discriminatory conduct, Plaintiffs suffered damages, including lost compensation, lost benefits, and emotional distress.

129.    Additionally, Plaintiffs are entitled to recover all attorneys' fees and costs expended in prosecuting this action.

130.    Defendants' unlawful conduct toward Plaintiffs was done with reckless disregard for their federally protected rights, and as such, Defendants should be subject to punitive damages as well.

### THIRD CAUSE OF ACTION
**(Intentional Interference with Economic Relations against Chevron)**

131.     Plaintiffs reallege and incorporates by reference those paragraphs set forth above.

132.    In retaliation for protected activity under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, Chevron induced Brahma to fire Plaintiffs.

133.    Chevron took this action to injure and punish Plaintiffs for participating in Joby Bratcher's race discrimination and retaliation lawsuit against Chevron.

134.    Chevron's acted using improper means and, as a result of Chevron's actions, Plaintiffs' jobs were terminated and they suffered lost wages and benefits among other things.

135.    Plaintiffs are entitled to recover lost wages and benefits, and for compensatory and punitive damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs, by and through counsel of record, and pursuant to Fed. R. Civ. P. 38 hereby demand a trial by jury of any issue triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against Defendants as follows:

1.      For an order and judgment against Defendant for appropriate back pay, lost benefits and reimbursement for any other of Plaintiffs' pecuniary losses;

2.      For reinstatement or front pay and benefits in lieu of reinstatement;

3.      For compensatory damages to compensate Plaintiffs for their emotional distress, loss of enjoyment of life, damage to reputation, and other non-pecuniary losses in amounts to be established at trial;

4.      For Plaintiffs' reasonable attorneys' fees and costs of court;

5.      For punitive damages in substantial, appropriate, and reasonable amounts; and

6.      For such further and other relief the court deems appropriate.

DATED this 6th day of September, 2017.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Lauren I. Scholnick
Lauren I. Scholnick
Jonathan K. Thorne
*Attorneys for Plaintiffs*

B:\CurrentClientsUT\Rodriquez, Rick\Pleadings\complaint final.docx